# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 20-1905V

| | |
|---|---|
| LINDA TIMBERLAKE,<br><br>                Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                Respondent. | Chief Special Master Corcoran<br><br>Filed: February 19, 2025 |

*Amy A. Senerth*, Muller Brazil, LLP, Dresher, PA, for Petitioner.

*Meghan Murphy*, U.S. Department of Justice, Washington, DC, for Respondent.

### **DECISION AWARDING DAMAGES**[1]

On December 18, 2020, Linda Timberlake filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleged that she suffered a left shoulder injury related to vaccine administration ("SIRVA"), a defined Table Injury, after receiving an influenza ("flu") vaccine on September 5, 2019. Petition at 1, ¶ 2. After I determined Petitioner was entitled to compensation in a substantive entitlement ruling, the parties were unable to resolve damages on their own,[3] so I ordered briefing on the matter.

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

[3] Almost five months after I determined Petitioner was entitled to compensation, the parties informed me that they had reached an impasse in their damages discussions and requested that I set a briefing schedule. Status Report, filed Sept. 17, 2024, ECF No. 40.
.

For the reasons set forth below, I find that Petitioner is entitled to an award of damages in the amount of **$108,607.10**, **representing $107,000.00 for actual pain and suffering, plus** $1,607.10 **for past unreimbursable expenses.**

**I.      Legal Standard**

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with my predecessor Chief Special Masters) adjudicating similar claims. *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by a Court of Federal Claims decision several years ago. *Graves v. Sec'y of Health & Hum. Servs.,* 109 Fed. Cl. 579 (Fed. Cl. 2013). *Graves* maintained that to do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Id.* at 590. Instead, *Graves* assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id.* at 595. Under this approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap. Although *Graves* is not controlling of the outcome in this case, it provides reasoned guidance in calculating pain and suffering awards – and properly emphasizes the importance in each case of basing damages on the specific injured party's circumstances.

## II.    Prior SIRVA Compensation Within SPU[4]

### A.    Data Regarding Compensation in SPU SIRVA Cases

SIRVA cases have an extensive history of informal resolution within the SPU. As of January 1, 2025, 4,545 SPU SIRVA cases have resolved since the inception of SPU ten years before. Compensation has been awarded in the vast majority of cases (4,397), with the remaining 148 cases dismissed.

2,506 of the compensated SPU SIRVA cases were the result of a ruling that the petitioner was entitled to compensation (as opposed to an informal settlement), and therefore reflect full compensation.[5] In only 270 of these cases, however, was the amount of damages determined by a special master in a reasoned decision.[6] As I have previously

---

[4] All figures included in this decision are derived from a review of the decisions awarding compensation within the SPU. All decisions reviewed are, or will be, available publicly. All figures and calculations cited are approximate.

[5] The remaining 1,891 compensated SIRVA cases were resolved via stipulated agreement of the parties without a prior ruling on entitlement. These agreements are often described as "litigative risk" settlements, and thus represent a reduced percentage of the compensation which otherwise would be awarded. Because multiple competing factors may cause the parties to settle a case (with some having little to do with the merits of an underlying claim), these awards from settled cases do not constitute a reliable gauge of the appropriate amount of compensation to be awarded in other SPU SIRVA cases.

[6] The rest of these cases resulting in damages after concession were either reflective of a proffer by Respondent (2,206 cases) or stipulation (30 cases). Although all proposed amounts denote *some* form of agreement reached by the parties, those presented by stipulation derive more from compromise than instances in which Respondent formally acknowledges that the settlement sum itself is a fair measure of damages.

stated, the written decisions setting forth such determinations, prepared by neutral judicial officers (the special masters themselves), provide the most reliable guidance in deciding what similarly-situated claimants should also receive.[7]

The data for all categories of damages decisions described above reflect the expected differences in outcome, summarized as follows:

|  | **Damages Decisions by Special Master** | **Proffered Damages** | **Stipulated Damages** | **Stipulated[8] Agreement** |
|---|---|---|---|---|
| **Total Cases** | *270* | *2,206* | *30* | *1,891* |
| **Lowest** | $30,000.00 | $5,000.00 | $45,000.00 | $1,500.00 |
| **1st Quartile** | $67,305.16 | $60,000.00 | $90,000.00 | $32,500.00 |
| **Median** | **$89,500.00** | **$80,000.00** | **$122,866.42** | **$50,000.00** |
| **3rd Quartile** | $125,000.00 | $107,987.07 | $162,000.60 | $75,000.00 |
| **Largest** | $1,569,302.82 | $1,845,047.00 | $1,500,000.00 | $550,000.00 |

### B. Pain and Suffering Awards in Reasoned Decisions

In the 270 SPU SIRVA cases in which damages were the result of a reasoned decision, compensation for a petitioner's actual or past pain and suffering varied from $30,000.00 to $215,000.00, with $87,000.00 as the median amount. Only ten of these cases involved an award for future pain and suffering, with yearly awards ranging from $250.00 to $1,500.00.[9] In one of these cases, the future pain and suffering award was limited by the statutory pain and suffering cap.[10]

---

[7] Of course, even though *all* independently-settled damages issues (whether by stipulation/settlement or proffer) must still be approved by a special master, such determinations do not provide the same judicial guidance or insight obtained from a reasoned decision. But given the aggregate number of such cases, these determinations nevertheless "provide *some* evidence of the kinds of awards received overall in comparable cases." *Sakovits v. Sec'y of Health & Hum. Servs.*, No. 17-1028V, 2020 WL 3729420, at *4 (Fed. Cl. Spec. Mstr. June 4, 2020) (discussing the difference between cases in which damages are agreed upon by the parties and cases in which damages are determined by a special master).

[8] Two awards were for an annuity only, the exact amounts which were not determined at the time of judgment.

[9] Additionally, a first-year future pain and suffering award of $10,000.00 was made in one case. *Dhanoa v. Sec'y of Health & Hum. Servs.*, No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018).

[10] *Joyce v. Sec'y of Health & Hum. Servs.*, No. 20-1882V, 2024 WL 1235409, at *2 (Fed. Cl. Spec. Mstr. Feb. 20, 2024) (applying the $250,000.00 statutory cap for actual and future pain and suffering set forth in Section 15(a)(4) before reducing the future award to net present value as required by Section 15(f)(4)(A); *see Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552, 554-55 (Fed. Cir.1994) (requiring the

4

In cases with lower awards for past pain and suffering, many petitioners commonly demonstrated only mild to moderate levels of pain throughout their injury course. This lack of significant pain is often evidenced by a delay in seeking treatment – over six months in one case. In cases with more significant initial pain, petitioners usually experienced this greater pain for three months or less. Most petitioners displayed only mild to moderate limitations in range of motion ("ROM"), and MRI imaging showed evidence of mild to moderate pathologies such as tendinosis, bursitis, or edema. Many petitioners suffered from unrelated conditions to which a portion of their pain and suffering could be attributed. These SIRVAs usually resolved after one to two cortisone injections and two months or less of physical therapy ("PT"). None required surgery. Except in one case involving very mild pain levels, the duration of the SIRVA injury ranged from six to 30 months, with most petitioners averaging approximately nine months of pain. Although some petitioners asserted residual pain, the prognosis in these cases was positive.

Cases with higher awards for past pain and suffering involved petitioners who suffered more significant levels of pain and SIRVAs of longer duration. Most of these petitioners subjectively rated their pain within the upper half of a ten-point pain scale and sought treatment of their SIRVAs more immediately, often within 30 days of vaccination. All experienced moderate to severe limitations in range of motion. MRI imaging showed more significant findings, with the majority showing evidence of partial tearing. Surgery or significant conservative treatment, up to 133 PT sessions - occasionally spanning several years, and multiple cortisone injections, were required in these cases. In nine cases, petitioners provided sufficient evidence of permanent injuries to warrant yearly compensation for future or projected pain and suffering.

### III.     Relevant Medical History

Prior to vaccination, Petitioner suffered from diabetes and arthritis with noted specific conditions – a herniated disc and left shoulder pain, included in all primary care provider ("PCP") prior medical records as follows:

> **Past Medical History Positives**
> **Diagnosis**
> - Arthritis
>   *herniated disc , lt shoulder pain*
>   Ch̶o̶l̶e̶l̶i̶t̶h̶i̶a̶s̶i̶s̶

Ex. 7 at 8, 23, 32. This diagnosis can also be found in the post-vaccination PCP medical

---

application of the statutory cap before any projected pain and suffering award is reduced to net present value).

5

records as well. *Id.* at 53, 60, 80, 83.

Although Petitioner received the flu vaccine in question on September 5, 2019, she did not complain of left shoulder pain until a PCP visit on November 8, 2019, approximately two months later. Ex. 7 at 53. At that visit, Petitioner also received follow-up care for her diabetes, high cholesterol, and palpitations and anxiety – all of which appeared to be well-controlled with medication. *Id.* at 53, 56. Under the discussion section of the record related to palpitations, it was noted that she was taking Propranolol,[11] an anti-anxiety medication. Ex. 7 at 53.

When first seeking treatment, Petitioner described her left shoulder pain, which she attributed to the flu vaccine she received two months earlier, as constant, and worse with movement. Ex. 7 at 53. The PCP prescribed Naproxen[12] and referred her to PT. *Id.* at 56.

At her first PT session on November 20, 2019, Petitioner stated that her pain level varied from four to seven out of ten, estimating that her current pain was four. Ex. 2 at 5. Although she reported improved motion in later sessions (*e.g., id.* at 14), her pain levels remained consistent (*id.* at 21, 28). After four PT sessions, she returned to her PCP, complaining that PT was not helping. Ex. 7 at 69. In response, the PCP prescribed 14-days of oral steroid (Prednisone) and referred her to an orthopedic surgeon. *Id.* at 72.

When seen by the orthopedic surgeon on January 2, 2020, Petitioner recounted that the Prednisone "helped a lot with inflammation, but discomfort is still there." Ex. 3 at 7. X-rays showed "AC arthritis with a [sic] superior bone spurs" and a small inferior osteophyte in the glenohumeral space. *Id.* at 9. Assessing Petitioner as suffering from shoulder impingement, acute left shoulder pain, subacromial bursitis of the left shoulder joint, and arthritis of the acromioclavicular joint, the orthopedic surgeon expressed reluctance to administer a steroid injection so close to the course of orals steroids, especially since Petitioner suffered from diabetes. He opined that Petitioner's arthritis, sometimes associated with subacromial impingement, would not explain her symptoms. Noting that Petitioner had made improvements in strength and movement, he recommended that she continue PT, and return within a month or two if her symptoms continued. *Id.*

---

[11] Propranolol is "a nonselective beta-adrenergic blocking agent that . . . decreases cardiac rate and output, reduces blood pressure, and is effective in the prophylaxis of migraine." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY ("DORLAND'S") at 1527 (32th ed. 2012).

[12] Naproxen is "a non-steroidal anti-inflammatory drug that is . . . used in the treatment of pain, inflammation, osteoarthritis, rheumatoid arthritis, gout," and other conditions. DORLAND'S at 1232.

After attending five additional PT sessions, Petitioner returned to the orthopedic surgeon in early February 2020, reporting improvements in motion, but continued pain. Ex. 3 at 13. On February 16, 2020, she underwent an MRI which revealed "an intrasubstance infraspinatus rotator cuff tendon tear and some tendinitis and also a question of a small superior labral tear and some AC joint primary osteoarthritis and some subacromial bursitis." *Id.* at 17; *see id.* at 42 (for MRI report). Noting that he "had a thorough conversation with [Petitioner] . . . about her pathology" (*id.* at 17), he opined that "there is a possibility that the flu injection caused some subacromial bursitis [but he] cannot say that this caused the labrum or rotator cuff partial tears" (*id.* at 17-18). Observing that Petitioner had experienced her pain for approximately five months, and had taken anti-inflammatory medication and attended PT, the surgeon recommended arthroscopic surgery. *Id.* at 18.

At her pre-operative surgical appointment on March 16, 2020, Petitioner reported heightened anxiety due to concerns related to the COVID pandemic and upcoming surgery. Ex. 10 at 61. She was prescribed new anxiety medication – Hydroxyzine.[13] *Id.* at 64.

Performed on March 24, 2020, the arthroscopic surgery included debridement with chondroplasty[14] and synovectomy[15] of the glenohumeral joint, subacromial decompression with partial acromioplasty,[16] rotator cuff repair (labral tears) with one swivel lock anchor, and excision of distal clavicle. Ex. 10 at 74-75 (filed previously at Ex. 4 at 6-7); *see also* Ex. 3 at 26. Post-surgery, diagnoses of multiple labral tears and synovitis[17] of the glenohumeral joint were added to the prior diagnoses: injury of muscle and tendons of the rotator cuff, acromioclavicular joint arthritis, and impingement syndrome. Ex. 10 at 75.

From early-April through late-July 2020, Petitioner showed significant improvement from 16 PT sessions. At her first sessions on April 2, 2020, she estimated that her pain level ranged from zero to five. Ex. 2 at 70. Reporting that she had finished

---

[13] Hydroxyzine is "a piperazine derivative with central nervous system depressant, antispasmodic, antihistaminic, and antifibrillatory actions." DORLAND'S at 884.

[14] Chondroplasty is the "repair of lacerated or displaced cartilage. DORLAND'S at 353.

[15] Synovectomy is "excision of a synovial membrane, as of that lining the capsule of the knee joint, performed in treatment of rheumatoid arthritis of the knee, or of the synovial sheath of a tendon." DORLAND'S at 1855.

[16] Acromioplasty is "the surgical removal of an anterior spur of the acromion o relieve mechanical compression of the rotator cuff during movement of the glenohumeral joint. DORLAND'S at 20.

[17] Synovitis is "the inflammation of the synovium, . . . usually painful, particularly on motion." DORLAND'S at 1856.

taking her pain medication (Norco)[18] that day and had no pain currently, she volunteered that she "does not think she will need to re-fill the prescription." *Id.* By her third PT session on April 8, 2020, she again reported no current pain and an ability to sleep through the night. *Id.* at 86. At her last PT session on July 27, 2020, Petitioner "stated she has some soreness but overall is feeling good." *Id.* at 176.

When seen by the orthopedic surgeon on July 30, 2020, Petitioner was noted to be "doing well" with controlled pain. Ex. 3 at 36. She was instructed to return on an as-needed basis. *Id.*

### IV. The Parties' Arguments

Petitioner asserts that she is entitled to a past pain and suffering award of $125,000.00, plus $1,808.88 for past unreimbursed expenses. Petitioner's Brief in Support of Damages ("Brief"), filed Nov. 15, 2024, at 1, ECF 46. Maintaining that her SIRVA "resulted in severe pain and limited range of motion" (*id.* at 6), she emphasizes the surgery she underwent in late March 2020, during the worldwide COVID Pandemic, her continued difficulty performing tasks requiring upper body strength and flexibility for the two months post-surgery, and the negative effect on her work as a substitute teacher (*id.* at 7-8).

Along with her damages brief, Petitioner filed a list of unreimbursed expenses, more detailed surgical records, and a cursory document regarding her employment as a substitute teacher. Exs. 9-11, filed Nov. 13, 2024, ECF Nos. 43-45. At a pre-operative visit on March 16, 2020, Petitioner complained of "some increased anxiety with the stress over the coronavirus outbreak" and requested medication to combat her increased anxiety. Ex. 10 at 61. The documentation related to Petitioner's employment provides her full and half-day rates, further explaining that "[s]he does not have a set schedule, [s]he is called when needed, [and] [w]e do not keep a log when a sub says not able to come in." Ex. 11.

Petitioner favorably compares the facts and circumstances in her case to those of the petitioners in *Drake, Randazzo*, and *Olson*[19] - decisions featuring pain and suffering awards ranging from $125,000.00 to $128,000.00. Brief at 9-12. Emphasizing similarities

---

[18] Norco is "trademark for combination preparations of hydrocodone bitartrate and acetaminophen. DORLAND'S at 1290. Hydrocodone is "a semisynthetic opioid analgesic derived from codeine but having more powerful sedative and analgesic effects. DORLAND'S at 878.

[19] *Drake v. Sec'y of Health & Hum. Servs.,* No. 18-1747V, 2020 WL 4674105 (Fed. Cl. Spec. Mstr. July 7, 2020) (awarding $125,000.00 for past pain and suffering); *Randazzo v. Sec'y of Health & Hum. Servs.,* No. 18-1513V, 2021 WL 829572 (Fed. Cl. Spec. Mstr. Feb. 1, 2021) (awarding $125,000.00 for past pain and suffering); *Olson v. Sec'y of Health & Hum. Servs.,* No. 21-0408, 2024 WL 1521634 (Fed. Cl. Spec. Mstr. Mar. 4, 2024 (awarding $128,000.00 for past pain and suffering).

in treatment – limited to conservative measures initially and then arthroscopic surgery within a year of vaccination, and good improvement but ongoing symptoms post-surgery - she insists that she suffered analogous symptom severity and duration. *Id.*

Respondent counters that Petitioner should be awarded $75,000.00 for pain and suffering. Respondent's Brief in Support on Damages ("Opp.") at 1. While acknowledging that Petitioner's SIRVA required surgical intervention, he maintains that Petitioner "experienced a mild-to-moderate SIRVA and had an excellent recovery ten months after vaccination." *Id.* at 5. To support the lower award, he emphasizes Petitioner's more than two-month delay in seeking treatment – resulting in only nine months of active treatment; "excellent recovery by mid-July 2020, ten months after she first sought treatment" (*id.* at 6); and multiple unrelated conditions identified on the MRI and repaired during surgery (*id.* at 6-7). He notes that I previously determined that these other conditions "were 'not necessarily vaccine-related' and were thus 'relevant when ascertaining the appropriate compensation.'" *Id.* at 7 (quoting *Timberlake v. Sec'y of Health & Hum. Servs.,* No. 20-1905V, 2024 WL 2698873, at *7 (Fed. Cl. Spec. Mstr. Apr. 23, 2024)).

As comparable cases, Respondent proposes *Hunt* and *Sheldon*,[20] in which $95,000.00 and $97,500.00, respectively, were awarded. Opp. at 10-11. Emphasizing that these petitioners underwent more active treatment and longer SIRVA duration, as well as the *Hunt* petitioner's pursuit of treatment only three weeks post-vaccination, he argues that Petitioner's award should be lower. *Id.* at 7-8. He also distinguishes the cases cited by Petitioner, stressing the lack of treatment delay and greater symptom severity in therein. *Id.* 8-10.

Regarding the amount of past expenses, Respondent opposes $201.78 identified as a collection fee. Opp. at 10; *see* Ex. 9 at 1-2 (surgical costs with this additional amount included on the first page summary). He argues that such an expense is not compensable under the Vaccine Act as it was not for any of the purposes listed in Section 15(a)(1)(B)(iii)). Opp. at 10. He agrees, however, that Petitioner should be awarded the remaining $1,607.10 in expenses. *Id.*

## V.     Appropriate Compensation

### A.     Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that at all

---

[20] *Hunt v. Sec'y of Health & Hum. Servs.,* No. 19-1003V, 2022 WL 2826662 (Fed. Cl. Spec. Mstr. June 16, 2022)' *Shelton v. Sec'y of Health & Hum. Servs.,* No. 19-0279V, 2021 WL 2550093 (Fed. Cl. Spec. Mstr. May 21, 2021).

9

times Petitioner was a competent adult with no impairments that would impact her awareness of her injury. Therefore, I analyze principally the severity and duration of Petitioner's injury.

When performing this analysis, I review the record as a whole to include the filed medical records, affidavits, and sworn declarations and all assertions made by the parties in written documents. I consider prior awards for pain and suffering in both SPU and non-SPU SIRVA cases and rely upon my experience adjudicating these cases. However, I base my determination on the circumstances of this case.

A thorough review of the medical records reveals that Ms. Timberlake suffered a SIRVA injury that did not prompt her to seek medical treatment until more than two months after the vaccination. Although her pain levels were moderate, she obtained improvement in strength and ROM, albeit not pain, during nine PT sessions. Almost seven months post-vaccination, she underwent arthroscopic surgery, and gained good symptom relief thereafter. During 16 post-surgical PT sessions, she consistently reported a lack of pain and required pain medication for less than three weeks post-surgery.

Additionally, there is significant evidence showing that at least some of Petitioner's symptoms and need for surgery were due to conditions unrelated to the flu vaccine she received, but due instead to preexisting arthritis and labral tears. And medical records from September 2017, list back issues and left shoulder pain related to arthritis. Furthermore, although it did not prevent Petitioner from satisfying the requirements for entitlement, her more than two-month delay provides evidence that her initial symptoms were not significant.

The *Hunt* case cited by Respondent is a good comparable case[21] – due to similarities in overall duration and post-surgery recovery, but there are differences which show a greater pain and suffering award is warranted in this case. Although the *Hunt* petitioner pursued treatment only 18-days post-vaccination, she reported lower initial pain levels and experienced some periods of complete relief, for example, after receiving several cortisone injections. *Hunt,* 2022 WL 2826662, at *8-9. In contrast, prior to surgery, Petitioner reported consistent, moderate pain, that appeared to be unaffected by PT, and reduced only slightly by oral steroids. Most importantly, Respondent failed to successfully explain why the award in this case should be at approximately $20,000.00 less than what

---

[21] In contrast, the *Shelton* case offers a poor comparison as the both the initial treatment delay and overall injury duration were more than twice that in this case. *Shelton,* 2021 WL 2550093, at *7-8. Other than the fact that both cases involved arthroscopic surgery, there are few similarities between *Shelton* and Petitioner's case. And I have previously discussed the lack of helpful guidance provided by *Shelton* for most other cases, given its unique facts. *See,* e.g., *Gray v. Sec'y of Health & Hum. Servs.,* No. 20-1708, 2022 WL 6957013, at *6 (Fed. Cl. Spec. Mstr. Sept. 12, 2022).

was awarded in either cited case - *Hunt* or *Shelton*.

Although Petitioner proposes an amount aligned with the pain and suffering amounts awarded in the comparable cases she cites, she similarly ignores significant factors which dictate a different (this time lower) award. In all cases, the petitioners reported more significant initial pain levels and pursued treatment within 30 days of vaccination. *Drake*, 2020 WL 4674105, at *2; *Randazzo*, 2021 WL 829572, at *2; *Olson*, 2024 WL 1521634, at *2. Additionally, the duration of the *Olson* petitioner's initial, more severe symptoms was much longer as she did not undergo surgery until 18-months post-vaccination. *Olson*, 2024 WL 1521634, at *2. And the *Drake* petitioner experienced severe limitations in his ROM, and continued symptoms even after surgery. *Drake*, 2020 WL 4674105, at *2-3.

Instead, *Double, Slugo,* and *Gray*[22] – involving awards ranging from $105,000.00 to $110,000.00 - offer better guidance. The *Double* and *Gray* petitioners also delayed seeking treatment until approximately 50 days post-vaccination. *Double,* 2024 WL 3648398, at *3; *Gray,* 2022 WL 6957013, at *6. And the *Slugo* and *Double* petitioners similarly suffered from other conditions addressed during surgery. Petitioner's facts and circumstances most closely resembles those experienced by the *Double* petitioner, who received an award of $105,000.00. Accounting for slight differences in duration and initial symptom severity, I will award a slightly higher amount to Petitioner - $107,000.00.

### B.   Unreimbursed Expenses

Regarding the amount of out-of-pocket expenses, I agree that the $201.78 paid by Petitioner for collection fees should not be reimbursed. This payment does not meet the requirements of Section 15(a)(1)(A)(iii), because it was not needed to diagnosis or treat Petitioner's symptoms. All other requested expenses will be awarded.

### Conclusion

For all of the reasons discussed above and based on consideration of the record as a whole, **I find that $107,000.00 represents a fair and appropriate amount of**

---

[22] *Double v. Sec'y of Health & Hum. Servs.,* No. 21-0682V, 2024 WL 3648398 (Fed. Cl. Spec. Mstr. June 27, 2024) (awarding $105,000.00 for past pain and suffering); *Slugo v. Sec'y of Health & Hum. Servs.,* No. 19-0635V, 2022 WL 627782 (Fed. Cl. Spec. Mstr. Jan. 31, 2022) (awarding $108,000.00 for past pain and suffering); *Gray*, 2022 WL 6957013 (awarding $110,000.00 for past pain and suffering).

11

compensation for Petitioner's actual pain and suffering.[23] **I also find that Petitioner is entitled to $1,607.10 in actual unreimbursable expenses.**

Based on the record as a whole and arguments of the parties, **I award Petitioner a lump sum payment of $108,607.10 to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a).

The Clerk of Court is directed to enter judgment in accordance with the Decision.[24]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

---

[23] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Hum. Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[24] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.